(No. 38027.—

The People of the State of Illinois, Defendant in Error, *vs.* Robert Lewis, Plaintiff in Error.

*Opinion filed March 18, 1965.*

SCHAEFER, J., dissenting.

RICHARD L. POLLAY, of Chicago, (JAMES C. WICK-LINE, CHARLES W. NAUTS, JOHN J. McCANN, and SHEL-DON RUBIN, of counsel,) for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and GEORGE W. KENNEY, Assistant Attorneys General, and ELMER C. KISSANE, and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE KLINGBIEL delivered the opinion of the court:

The defendant, Robert Lewis, was tried by the court convicted of the crime of murder for which he was sentenced to the penitentiary for a term of 20 years. He contends on this writ of error that his confession was improperly admitted in evidence and that the evidence was insufficient to establish his guilt.

We shall first consider the claim with respect to the confession, for the question of whether it was properly admitted in evidence is a significant factor in determining whether the evidence was sufficient to establish his guilt. The evidence showed the defendant was arrested at about 6:00 P.M., immediately following the shooting out of which without a jury in the criminal court of Cook County and

the murder charge arose. At about 8:00 P.M. he was identified in a police line-up. A little after midnight an assistant State's Attorney arrived at the police station and at about 1:00 o'clock in the morning he took a statement from the defendant and a co-defendant. There is no evidence concerning the interrogation of the defendant between the time of his arrest and the time the statement was taken. At 10:00 in the morning the defendant signed the written statement which had been transcribed by a court reporter. The defendant was not represented by counsel at any time prior to the time that he signed the statement.

The defendant argues that the statement was inadmissible because it was obtained while he was in police custody without the benefit of counsel and because his right to counsel and the right to refuse to answer questions had not been explained to him. The defendant points out that he was at that time only 15 years of age and it is argued that his youthfulness and inexperience required the assistance of counsel. Counsel for the defendant also refers to an article describing police methods of obtaining confessions and, in the absence of any evidence of improper conduct by police officers, asks us to take judicial notice that improper procedures are used to obtain confessions. We limit our consideration to the evidence in the record and do not adopt counsel's suggestion.

Principal reliance is placed upon *Escobedo* v. *Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L. ed. 2d 977. In *Escobedo* the defendant had requested counsel and his request had been denied. In *People* v. *Hartgraves,* 31 Ill.2d 375, we held that where there was no evidence that counsel was requested, a failure to warn the accused of his constitutional right to counsel and his right to remain silent did not render a confession inadmissible. The present case is governed by our decision in *Hartgraves*. There was no evidence of improper conduct and, in the absence of a request by the defendant, the failure of the authorities to advise him of his

right to counsel and his right to remain silent does not render the confession inadmissible.

We turn now to a consideration of the defendant's claim that the evidence was insufficient to establish his guilt. The evidence showed that the deceased, a teen-age boy who was a member of a gang known as the Vice Lords, was killed during a fight between the Vice Lords and another gang, the Egyptian Cobras, of which the defendant was a member. A member of the Vice Lords testified that as he and a girl companion were walking toward the intersection of 13th and Harding streets in the city of Chicago, they heard some shooting. He saw the deceased run across the intersection toward the defendant, who was armed with a rifle. The defendant shot at the deceased, who fell in the middle of the street. The defendant continued to fire the rifle and one of the shots wounded another boy. The witness testified that when he first observed the disturbance at the intersection there were about 6 or 7 members of the Vice Lords on the corner, and that all of these boys ran across the street toward the defendant. After the deceased was shot, the witness picked up a piece of pipe and saw that another member of the Vice Lords also had a pipe in his hands. He testified that he and the other boy were the only ones that had any weapons. He testified that after the deceased had been shot other members of the Vice Lords gang appeared on the scene and that there were 15 or 20 of them present at one time.

The companion of this witness testified that she saw a boy kneel down and shoot a rifle. She did not see any other weapons in the hands of any of the participants of the fight. Another witness, a former member of the Vice Lords, testified that he arrived on the scene after the deceased had been shot and that as he ran to the scene of the fight he was shot in the shoulder. He testified that none of the Vice Lords had any weapons at the time of the shooting. The brother of the deceased also arrived at the scene after the

shooting and saw the defendant standing on the corner with a rifle in his hands. The witness had no weapon and did not see any one other than the defendant with a weapon.

A police officer testified that he observed some boys whom he believed to be members of the Vice Lords, proceeding toward the corner armed with sticks and clubs. After the shooting he arrested the defendant and 2 other boys. The defendant denied that he had shot the deceased.

In the defendant's written confession he said that he was a member of the Cobra gang. Earlier on the day of the crime, he and other members of his gang had had an encounter with a member of the Vice Lords. The defendant and his companions chased him until he picked up a brick and threw it at the defendant. He and other members of the Cobra gang later saw about 15 or 20 members of the Vice Lords gang at the intersection where the shooting occurred. When he saw the Vice Lords he ran to a basement to get a gun which he had hidden there. Before the shooting he had practiced with the rifle by shooting at "No Parking" signs. After obtaining the rifle from the basement he went back to the corner and when the members of the Vice Lords gang started running across the street he shot a couple of times and saw the deceased fall. He handed the gun to a companion who shot it several times and then took the gun back and shot 3 or 4 more times, wounding the other boy.

In defense, several witnesses testified that they saw numerous members of the Vice Lords gang armed with sticks, bottles, pipes and bricks and that these boys threw these weapons at the defendant and other members of the Cobra gang. Three of these witnesses testified that they ran from the scene when they saw the members of the Vice Lords gang approaching.

The defendant testified that when he saw the Vice Lords gang approaching with their weapons, he entered the basement through an open window and tried to escape through a back door. The back door was locked and he thought he

was trapped in the basement where the Vice Lords could attack him, so he picked up the gun which he had previously hidden in the basement and went out the window and returned to the corner. He testified that 15 or 20 members of the Vice Lords gang started running across the street toward him and that some of them had pipes in their hands and that one boy was about to throw a pipe at him. The defendant testified that he first shot in the air in an attempt to scare the other gang, but that when they did not stop he shot into the crowd. He saw a boy grab his chest and he then became frightened and began shooting over their heads. He testified that he had previously had trouble with members of the Vice Lords gang and that he had been beaten by them on 2 or 3 previous occasions.

A co-defendant testified that when he saw 15 or 20 members of the Vice Lords gang approaching armed with sticks, pipes and broken bottles, he ran into an alleyway and saw the defendant run into a basement. One of the Vice Lords gang saw him and all of the members of the gang started running toward him. He started to run away and then heard a shot and turned back to see what had happened. He saw the defendant standing on the sidewalk firing a gun and noticed one boy grab his chest. He told the defendant to give him the rifle so that the defendant could escape and he took the rifle and started shooting in the air. The defendant then took the rifle from him and shot and wounded another member of the Vice Lords gang.

The defendant does not deny shooting the deceased, but claims that the killing was in self-defense and also claims that there is no evidence of malice. The principles applicable in cases such as this have been set forth in *People* v. *Hughes*, 26 Ill.2d 114, and *People* v. *Wrenn*, 29 Ill.2d 581, also involving encounters between members of the Vice Lords gang and another gang. In those cases we held that the killing of a human being, even though involuntary, constitutes the crime of murder, if it occurs during the com-

mission of an unlawful act, which in its consequences naturally tends to destroy human life. The evidence, including the confession of the defendant, does not support the claim of self-defense. In his statement, the defendant said that when he saw the Vice Lords gang approaching he ran to the basement to get the rifle and then returned to the intersection. Other members of the defendant's gang fled the scene when they saw the members of the other gang approaching, but instead of avoiding the conflict, the defendant, according to his confession, armed himself with a deadly weapon and returned to the scene. The deliberate return to the conflict is inconsistent with a claim of self-defense. Furthermore, the defendant's original denial that he had shot the deceased weighs against such a claim. (*People* v. *McCreary*, 29 Ill.2d 295, 300.) Our holdings in *Hughes* and *Wrenn* are decisive as to the defendant's claim that malice had not been established, for the evidence shows that the killing was the consequence of the defendant's unlawful act.

We find that the defendant's confession was properly admitted in evidence and that the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt. The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE SCHAEFER dissenting:

For the reasons stated in my dissenting opinion in *People* v. *Richardson, post,* p. 472. I think that it was error to admit the confession taken from this 15-year-old defendant, by an attorney for the prosecution, without having advised the defendant that he need not answer the questions put to him, and that he, too, was entitled to the advice of an attorney.