# IN THE COURT OF APPEALS OF IOWA

No. 24-0496
Filed June 18, 2025

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**JESUS ISAI DIAZ,**
 Defendant-Appellant.
_____

 Appeal from the Iowa District Court for Ida County, Tod Deck, Judge.


 The defendant challenges his conviction for murder in the second degree.

**AFFIRMED.**


 Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer (argued), Assistant Appellate Defender, for appellant.

 Brenna Bird, Attorney General, and Joshua Henry (argued), Assistant Attorney General, for appellee.


 Heard at oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**AHLERS, Judge.**

There is no dispute that Jesus Diaz stabbed his brother—Eduardo "Eddie" Diaz III—to death. A jury determined the stabbing constituted murder in the second degree. Jesus[1] appeals.

## I. Factual Background

Jesus and Eddie had a history of fighting during their childhood, with Eddie—who was larger—often acting as the aggressor. Although the fighting had diminished during their adulthood, the tension between the brothers resurfaced on November 13, 2022, after they spent the afternoon drinking and watching football. Eddie was trying to get his girlfriend to pick him up, while Jesus became increasingly upset that Eddie refused to leave Jesus's house. The situation quickly escalated into a physical altercation. No one witnessed the entire fight, but at some point, Jesus stabbed Eddie thirteen times and Eddie died as a result. Jesus does not dispute that he stabbed Eddie. Instead, he argues his actions were a result of serious provocation.

The State charged Jesus with murder in the first degree. The jury found him guilty of the lesser offense of murder in the second degree.

## II. Issues

On appeal, Jesus contends the evidence was sufficient to support a voluntary-manslaughter charge but was insufficient to support a second-degree-murder charge. He also contends the district court erred in instructing the jury about inferences of malice related to use of a dangerous weapon and in denying

---

[1] To avoid confusion due to the shared surname of the brothers, we refer to them by first names.

his motions for a mistrial. We address each contention in turn, starting with his sufficiency challenge because success on that challenge would require us to remand for judgment of acquittal, making it unnecessary to address his remaining challenges. *See State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

### III. Sufficiency of the Evidence

Before tackling the merits of Jesus's sufficiency-of-the-evidence challenge, we first address the State's contention that Jesus did not preserve error for the portion of his argument that suggests the evidence was insufficient because the jury should have been required to consider the lesser-included offense of voluntary manslaughter prior to rendering a verdict on the greater charge of second-degree murder. We conclude this is not a sufficiency-of-the-evidence challenge. It is a challenge to the jury instructions. And to make this challenge to the jury instructions, Jesus was required to object to preserve the issue for appellate review. *See State v. Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015) (finding a failure to preserve error by failing to object to jury instructions because "[t]he district court never had an opportunity to consider the underlying legal merits of not allowing the jury to consider a lesser offense until the defendant was acquitted of the greater offense"). As Jesus did not object to this aspect of the jury instructions, he did not preserve the issue for appeal.

Turning to the merits of his sufficiency challenge, Jesus argues that the evidence presented at trial was sufficient only to support a conviction for voluntary manslaughter, not murder in the second degree. We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Cook*, 996 N.W.2d 703, 708 (Iowa 2023). We uphold a jury verdict supported by substantial

evidence. *Id.* Evidence is substantial if it could convince a rational factfinder of the defendant's guilt beyond a reasonable doubt. *Id.* In assessing the sufficiency of the evidence, we view the evidence, including legitimate inferences and presumptions that can be fairly and reasonably deduced from it, in the light most favorable to the State. *Id.*

The district court gave the jury a marshaling instruction for murder in the second degree that required the State to prove:

> 1. On or about November 13, 2022, Jesus Diaz stabbed Eduardo Diaz III.
> 2. Eduardo Diaz III died as a result of being stabbed.
> 3. Jesus Diaz acted with malice aforethought.
> 4. The defendant was not justified.

Jesus contends the State failed to prove the third element. He claims the evidence only supports a finding he acted due to serious provocation (supporting a conviction for the lesser offense of voluntary manslaughter) and not with malice. The same argument was made to the jury, which rejected it in finding Jesus guilty of murder in the second degree. Jesus's sufficiency challenge on appeal is little more than a request for us to reweigh the evidence and substitute his view of the facts for that of the jury—a task outside of our authority. *See State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022).

Based on the evidence, a reasonable juror could have found any number of narratives that did not involve Jesus being seriously provoked into killing Eddie. One of those narratives would consist of these facts. Jesus and Eddie frequently fought during their childhood, and Eddie was often the instigator. However, as the brothers grew older, the frequency of physical altercations diminished. There was only one confrontation between the brothers in adulthood, which occurred

approximately one year before Eddie's death. During that incident, Jesus asked Eddie to leave his home, and when Eddie refused, the brothers began fighting. It escalated to the point of Eddie placing Jesus in a headlock. The fight ended when Jesus's then-girlfriend intervened and threatened to strike Eddie with a skillet. After that, Eddie left the residence. In the year following this event, witnesses testified that the brothers maintained a good relationship.

On the night of Eddie's death, the brothers had been drinking and watching football throughout the afternoon. Jesus had his two-year-old daughter with him, and Eddie's two children were also present. Around 5:30 p.m., Eddie's girlfriend picked up their children. The brothers appeared to be in good spirits, though both seemed intoxicated. One hour later, Jesus informed the mother of his child that the child had gotten a black eye. Both Jesus and Eddie assured her that the injury was accidental, but the mother informed Jesus that she was going to pick up the child. At 7:16 p.m., Eddie texted his girlfriend asking to be picked up because Jesus and the child's mother were arguing. At 7:32 p.m., the mother of Jesus's child called to notify him that she was on her way to pick up the child. During the call, Jesus was in his vehicle and upset because Eddie refused to leave. Jesus could be heard telling Eddie that he was trespassing, while Eddie could be heard yelling back, though his exact words were unclear. It is at this point of the night that the sequence of events becomes harder to piece together, as witnesses only observed fragments of the altercation between Jesus and Eddie.

Three teenage friends were driving around when they noticed a fight occurring in front of a house. They decided to continue driving but wanted to circle back to watch the fight. At first, the men involved were standing and facing each

other.  When the teenagers returned after circling the block, the men were wrestling on the ground.  They described the men as "one bigger man" and "one smaller man," which aligned with the fact that Eddie was notably larger than Jesus.  One of the men appeared to be choking the other with his arm.  The teenagers believed the bigger man was on top but were not entirely sure.

On the third pass, they saw the smaller man punching the bigger man with uppercuts.  Eventually, the teenagers parked in a nearby alley with a limited view of the front of the house.  From there, they saw the bigger man being kicked out of the house and running across the street.  He appeared exhausted before he stumbled backward and collapsed to the ground.  This prompted the teenagers to drive away, but as they did so, they observed the smaller man cross the street and begin stomping on the bigger man's head.  The bigger man did not appear to fight back.  On their final pass, the friends saw the smaller man placing something into his car while the bigger man remained on the ground.

When the mother of Jesus's child arrived around 7:40 p.m., she noticed blood on the trunk of his car.  Before she could knock, Jesus opened the door while holding the child.  Both he and the child were covered in blood.  By the time first responders arrived, Eddie had died from thirteen stab wounds.  The knife used in the stabbing was discovered behind the driver's seat of Jesus's car—the same car into which the teenagers saw Jesus place an item.

On appeal, Jesus asks the court to accept a single narrative of what happened that night—that he was provoked into stabbing Eddie and is therefore only guilty of voluntary manslaughter.  But no evidence was presented of Eddie provoking Jesus that night.  While jurors could have believed Eddie had done or

said something to provoke Jesus, they just as reasonably could have found that Jesus acted with malice, not from serious provocation or justification, when he chose to exit his home after he had locked Eddie outside, grab a knife, chase after Eddie, and stab him thirteen times. *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence." (citation omitted)). He then hid the knife. *See Williamson v. Jones*, 936 F.2d 1000, 1003 (8th Cir. 1991) (noting evidence of attempted concealment of a murder weapon may be considered by the jury as evidence tending to show a consciousness of guilt).

Viewing the evidence in the light most favorable to the State, including all reasonable inferences and presumptions that can be deduced from it, substantial evidence supports the jury's finding that Jesus committed murder in the second degree. Accordingly, Jesus's challenge to the sufficiency of the evidence fails.

## IV.   Inference of Malice

Jesus also contends the district court erred in giving jury instructions that permitted the jury to infer malice from use of a dangerous weapon. He contends such inference is improper when "the defendant had adequate provocation."

The State asserts that Jesus failed to preserve error on this issue, and we agree. While Jesus objected to the instructions addressing inference of malice from use of a dangerous weapon, his objection was based solely on the claim that the evidence supported a claim of self-defense and, therefore, the instructions should not be given. This is not the same as the objection he lodges on appeal, which is that the jury could only infer malice from the use of a dangerous weapon

after it had first considered and rejected the serious provocation necessary to support a conviction for voluntary manslaughter. To preserve error for appeal on a claim of a faulty jury instruction, a specific objection to the instruction must be made. *See State v. Maghee*, 573 N.W.2d 1, 8 (Iowa 1997) ("A party's objection to the court's instruction must be sufficiently specific to alert the district court to the basis for the complaint so that if there is an error the court can correct it before submitting the case to the jury."). A party may not change the basis of an objection from that made at trial. *Id.* ("[A] party is bound by the objection the party makes to the district court's instructions and may not amplify or change the objection on appeal."). As Jesus is lodging an objection to the challenged instructions on appeal that differs from the objection made to the district court, he has not preserved this issue for our review.

**V.     Motions for Mistrial**

For his final challenge, Jesus contends the district court erred in denying his motions for mistrial. He contends the motions should have been granted individually and based on the cumulative effect of the State's actions that led to the mistrial motions. The mistrial motions were based on testimony from three witnesses called by the State: (1) Eddie's girlfriend briefly mentioned during direct examination that Jesus had previously been to prison; (2) a deputy sheriff testified that Jesus exercised his right to remain silent during questioning; and (3) a special agent from the Iowa Division of Criminal Investigation (DCI) testified that Jesus recorded himself driving 105 miles per hour in the afternoon of the day of the stabbing. The district court denied all three motions.

**A.      Error Preservation as to the Second Motion for Mistrial**

Before we get to the merits of Jesus's challenge, we first address the State's contention that Jesus failed to preserve error as to the second event underlying the mistrial motions—the testimony that Jesus exercised his right to remain silent during questioning.  Although Jesus objected to this testimony, the objection was not made until after the deputy's examination had concluded, the State's direct examination of the next witness had finished, and the defense's cross-examination of that witness was under way.  While a break was taken for the new witness to refresh his memory, Jesus's counsel moved for a mistrial based on the prior witness's testimony.

"[A] motion for mistrial must be made when the grounds therefore first become apparent."  *State v. Jirak*, 491 N.W.2d 794, 796 (Iowa Ct. App.1992).  We recognize that defense counsel may have been reluctant to draw further attention to the testimony, but the record reflects that counsel recognized the issue immediately yet waited a substantial amount of time to raise it.  *See id.* at 796–97.  As the State correctly points out, waiting as long as Jesus did to make the objection deprived the court of the opportunity to remedy the situation by striking the testimony and giving an immediate curative instruction—both recognized methods for alleviating prejudice from improper testimony.  *See*, *e.g.*, *State v. Kieffer*, 17 N.W.3d 651, 658 (Iowa 2025) ("When evidence is introduced contrary to an order in limine, but the district court promptly strikes the evidence and admonishes the jury to disregard it, a mistrial may be granted only when the forbidden evidence is so prejudicial that its effect on the jury could not be erased by the district court's admonition.").  We find the delay between the challenged testimony and the motion

for mistrial in this instance was too long to preserve error. *See State v. Stock*, No. 22-1432, 2024 WL 466570, at *5 (Iowa Ct. App. Feb. 7, 2024) (finding that waiting until after the witness was excused to make a motion for mistrial based on the witness's testimony was too late to preserve error); *State v. Brown*, No. 14-0667, 2015 WL 5577971, at *4 (Iowa Ct. App. Sept. 23, 2015) (same). As a result, we do not address Jesus's second claimed basis for a mistrial.

**B.     Preserved Claims**

As to the denials of Jesus's motions for mistrial related to the other two grounds, error is preserved. We review a ruling on a motion for mistrial for an abuse of discretion. *State v. Brown*, 5 N.W.3d 611, 614–15 (Iowa 2024). An abuse of discretion occurs "where there is no support in the record for the trial court's determination." *Jirak*, 491 N.W.2d at 796. A new trial is only appropriate "if the prejudice resulting from the denial prevented the defendant from having a fair trial." *State v. Brown*, 996 N.W.2d 691, 696 (Iowa 2023) (citation omitted).

**1.     Prior Incarceration**

While describing the changing dynamic between Eddie and Jesus, Eddie's girlfriend explained why the brothers had grown distant at a certain point in their relationship:

> Q. And so when you say you wouldn't really be around them, how often do you mean?
> A. Well, I don't remember the year that he got sentenced to prison so—
> Q. So 2018 you moved out. Do you know when Jesus moved to Galva?
> A. After he got out.

Jesus immediately requested a recess, and the jury was excused. Jesus then moved for a mistrial. He argued that the reference to his prior incarceration

constituted improper character evidence and would potentially force him to address the issue if he chose to testify at trial. As it was late in the day, the district court reserved its ruling until the following morning.

The next morning, the district court denied the motion because the comment was an isolated incident and there was no observable reaction from the jury suggesting that it had prejudiced the proceedings. *See Kieffer*, 17 N.W.3d at 658 (recognizing the considerable discretion given to the district court in ruling on a motion for mistrial because that court is in a better position to gauge the effect on the jury). The court offered Jesus an opportunity to propose a limiting instruction or to renew the mistrial motion at the close of evidence. Jesus declined both options.

Nothing in the record indicates that the district court abused its discretion in denying Jesus's motion for a mistrial. The statement was isolated and made early in the presentation of evidence, and, at the time of the ruling, the court acted promptly to offer appropriate remedies. *See State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (finding that an isolated reference to the defendant's prior charges did not warrant a mistrial when considered in the context of the entire trial). As we find no abuse of the district court's discretion, we deny this claim for relief.

### 2. Speeding

Later in the trial, the State presented testimony to describe the events leading up to the altercation between Jesus and Eddie. A DCI agent testified that Jesus had recorded a video of himself driving 105 miles per hour that afternoon. Jesus immediately requested a recess and moved for a mistrial. He argued that the speed at which he was driving was wholly irrelevant to the issues at trial.

Defense counsel also observed that one of the jurors "literally turned their head to look at our client in what I could only expect was something negative, perhaps alarm."

Following a discussion outside the presence of the jury, the attorneys and court agreed that the jurors would be brought back into the courtroom, defense counsel would formally object to the testimony on the grounds of relevance and unfair prejudice, the court would sustain the objection, and the court would strike the testimony about Jesus's driving speed. That is what transpired, with the court also giving this verbal instruction:

> The jury will disregard the last part of the answer. . . . It is not relevant to the issues that you have to decide what speed the defendant was traveling at the time referenced in the witness's testimony. That is not an issue—that is not a fact that is relevant to your determination.

For a mistrial, Jesus would need to establish the statement regarding his speeding was so prejudicial the effect upon the jury could not be erased. *See State v. Christensen*, 929 N.W.2d 646, 659 (Iowa 2019). He has not done so here. In general, and in this instance, curative instructions are sufficient to remedy the error. *See id.* While the juror who reacted may have been momentarily surprised by the testimony, the district court instructed the jury to disregard it. We have no reason to believe the jury failed to follow that instruction. *See State v. Davis*, 951 N.W.2d 8, 17 (Iowa 2020) ("We presume juries follow the court's instructions." (citation omitted)). The district court adequately remedied the issue and did not abuse its discretion in denying the motion for a mistrial on the basis of the DCI agent's testimony about Jesus speeding.

## C.    Cumulative Effect

Jesus argues that even if no single error warranted a mistrial, the cumulative effect of multiple errors deprived him of a fair trial.  We assess this claim only with respect to the two mistrial motions for which Jesus preserved error.  He has the burden of establishing prejudice.  *See State v. Frei*, 831 N.W.2d 70, 80-81 (Iowa 2013), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699, 708 (Iowa 2016).

Upon reviewing the entire record, we conclude that the combined effect of the two challenged statements for which Jesus preserved error did not result in sufficient prejudice to warrant a mistrial.  The statement about Jesus's incarceration was a passing comment made during the first day of testimony in a trial that spanned roughly two weeks.  The officer's testimony about Jesus driving 105 miles per hour was promptly met with an objection, and the court sustained the objection, struck the testimony, and gave a curative instruction.  Iowa courts have consistently held that juries are presumed to follow such instructions.  See *Davis*, 951 N.W.2d at 17.

In light of the isolated and brief nature of both statements, the swift actions to remedy their admission by the district court, and the lack of evidence to establish prejudice, Jesus has not shown that the cumulative effect of the alleged errors denied him a fair trial.  The district court did not abuse its discretion in denying the motions for mistrial, and we affirm its rulings.

## VI.    Conclusion

The evidence presented at trial was sufficient to support the jury's verdict finding Jesus guilty of second-degree murder.  Because Jesus's challenge to the

jury instructions was not preserved for appellate review, we do not address it. As to the challenges to the district court's rulings on Jesus's motions for mistrial that were preserved, the district court did not abuse its discretion in denying them and those denials did not deprive Jesus of a fair trial. Accordingly, we affirm the conviction.

**AFFIRMED.**